L. W. SPRATT, ET AL., APPELLANTS, VS. C. O. LIVINGSTON, APPELLEE.

1. By the act of Congress passed in 1881, Chapter 64, United States Statutes at Large, amending the original and amendatory act creating the Freedman's Savings and Trust Company, the Secretary of the Treasury was authorized and directed to appoint the Comptroller of the Currency a com-

missioner of said company for the purpose of disposing of its property and winding up its business. Upon his qualifying by taking the oath and giving the bond prescribed in the act, the Comptroller of the Currency, as such commissioner, became invested with the legal title and possession of all the property of said company, and clothed with all the rights and privileges, and required to perform all the duties of the three commissioners appointed under the amendatory act of 1874, Chapter 349, whose functions ceased upon the appointment and qualificat'on of the Comptroller as such commissioner.

2. The purpose, as well as the effect, of the amendatory act of Congress making the Comptroller of the Currency a commissioner of the Freedman's Savings and Trust Company, was to invest him, as such commissioner, with the property, management and disposition of the affairs of said company for the purposes of liquidation, and he thereby became the statutory substitute and successor of the corporation itself, and not a mere trustee of the bare legal title of its property.

3. G. instituted a suit of attachment in the State Circuit Court against the Comptroller of the Currency, as Commissioner of the Freedman's Savings and Trust Company, to recover for services rendered and money expended by him as agent of said commissioner in winding up a branch business of said company in the State; the commissioner appeared and interposed pleas to the merits of the suit, and after trial, judgment was rendered in favor of G., and real estate in possession of the commissioner was sold under execution emanating from the judgment, and L. became the purchaser at said sale; no objection was made by any depositor or beneficiary of the company to the legal proceedings against the commissioner, and after paying the judgment in favor of G., a balance of the purchase money arising from the execution sale was paid to the commissioner : *Held*, that L. acquired the legal title to said real estate at said sale, and could recover the same in an action of ejectment against S., who had gone into possession of the property under a contract of purchase from the commissioner, but had refused to comply with the terms of his purchase, and was not entitled to a specific performance of his contract.

4. The possession of real estate by one who enters under an agreement to purchase from the owner, but without paying

the consideration price, can not be adverse until he re-
pudiates the seller's title and asserts his own title to the
property.

Appeal from the Circuit Court for Duval county.

The facts of the case are stated in the opinion of the
court.

*L. W. Spratt, in pro. per.*, and *W. B Young* for
Appellants.

*H. Bisbee* for Appellee.

MABRY, J.:

C. O. Livingston brought a suit of ejectment in the
Circuit Court for Duval county, in March, A. D. 1889,
against L. W. Spratt and W. B. Barnett, to recover
possession of a certain lot of land described in the de-
claration and situated in the city of Jacksonville, Du-
val county, Florida. A trial of the cause before the
court without a jury resulted in a finding and judg-
ment for the plaintiff, and the defendants appealed.

To maintain his action the plaintiff first introduced a
deed from J. P. Sanderson and wife bearing date Feb-
ruary 7th, A. D. 1870, conveying to the Freedman's
Savings and Trust Company lot eight (8) in block
thirty-one (31) as described on the plan of the said
city of Jacksonville. This lot embraces the land in
controversy in this suit. Next a certified copy of the
record of a certain cause in the Duval Circuit Court
where Jonathan C. Greeley was plaintiff and William
L. Trenholm, the Comptroller of the Currency, as Com-
missioner of the Freedman's Savings and Trust Com-
pany, was defendant. This suit was commenced by at-
tachment, the affidavit therein alleging that the defend-
ant Trenholm, Comptroller of the Currency of the Uni-.

ted States, as Commissioner of the Freedman's Savings and Trust Company, was justly indebted to the affiant, Greeley, in the sum of $7,673.88, which sum was actually due from said Trenholm, as such commissioner, and that he resided beyond the limits of the State of Florida.

The defendant appeared by attorneys, and filed pleas to the merits of the cause, which, after issue joined, was referred to a referee for decision. After hearing the testimony offered and argument of counsel the referee rendered judgment in favor of the plaintiff, Greeley, against the defendant, William L. Trenholm, Comptroller of the Currency, as Commissioner of the Freedman's Savings and Trust Company, for the sum of $5,186.77, and costs of suit.

The record shows that Greeley's suit was for moneys paid out by him for costs and expenses incident to litigation over the property held by the defendant, and known as the "Freedman's Savings Bank Building" situated in Jacksonville, Florida, and also for compensation to Greeley for services rendered by him as agent for defendant as such commissioner at Jacksonville.

Following the introduction of this record plaintiff put in evidence a certified copy of an execution emanating from the judgment rendered, and a deed from the sheriff of Duval county on a sale under said execution conveying the said lot eight (8) block thirty-one (31) to the plaintiff in this suit.

A notice of the sale of the "Freedman's Bank Building" at auction by the commissioner, was shown, and J. C. Greeley for the plaintiff testified that the Freedman's Savings and Trust Company went into possession of the property sued for in this suit in 1870 and remained in possession until the failure of the bank,

and then the commissioners appointed under the act of Congress went into possession and remained in possession until about the 25th day of March, 1880, when L. W. Spratt became the purchaser at the auction sale; that Spratt got into possesson of the portion of the property sued for in this action by the attornment to him of the then tenant and who is his co-defendant in this suit, and that he, Spratt, afterwards refused to comply with the terms of sale and refused to surrender possession. He also stated that he was the agent of the commissioners of the Freedman's Bank in the management of its real estate in Jacksonville from March, 1880, to the time of the trial of this suit.

Defendants did not offer to show any paper title to the lot in question but testified that they were present at the sale of lot eight (8) in block thirty-one (31), known as the "Freedman's Bank property", and at this sale and before the bidding began it was announced by the agent of the vendor that there was some defect in the chain of title which the vendor would have corrected in a few days, thirty being named as a limit in which this was to be done and a a sufficient title to be made to the purchaser; that the purchaser at the sale was required to make a cash payment of $500.00 and was then to be let into possession of the premises, the balance of the purchase money to be paid when good title was tendered; that Spratt became the purchaser of said lot and paid cash the $500.00, and Greeley, who, as agent for the commissioners, had been renting the building and collecting the rents, directed the tenants to attorn to him, Spratt, and gave him a key to a vacant room in the building; that Barnett did attorn to Spratt and has ever since recognized him as landlord.

Further, that shortly after the purchase by Spratt, Greeley as the agent of the commissioners, tried to get Barnett to refuse to recognize Spratt as landlord, and to pay rent to the commissioners, and asserted that Spratt had no right to the possession. Also that said commissioners caused suits to be instituted against Barnett before the County Judge of Duval county in August 1880, to oust him of possession of said lot, and several suits were commenced by said commissioners against Barnett in the Circuit Court for Duval county in relation to said premises. Certified copies of the record of proceedings in both the County and Circuit Courts for Duval were offered in evidence by defendants. One was a proceeding in the County Court by the Commissioners of The Freedman's Savings and Trust Company against W. B. Barnett, delinquent tenant, August 11th, 1880, and the decision was favorable to Barnett. Another was by Knox, Commissioner, against Barnett, assumpsit for rent, commenced on July 8th, 1880, and resulted in a judgment for defendant Barnett. Another was an action of ejectment commenced by Knox, Commissioner of the Freedman's Savings and Trust Company in September, 1882, against Barnett. This action it seems was dismissed on the plaintiff's motion.

Barnett further testified that he had been in the exclusive and continuous occupation of the premises sued for since the 25th of March, 1880, as the tenant of his co-defendant, Spratt, and Spratt testified that he had been furnished by the agent of the Commissioners of the Freedman's Savings and Trust Company, at the time of his purchase, with a list of the tenants and the amount of their rent, and the key to a vacant room in the building, and that he renewed the lease to Barnett and took possession of the vacant room; that

some time in the summer of 1880 Greeley, acting as the agent of the commissioners, forcibly entered said room and ejected him therefrom; also that the Commissioners of the Freedman's Savings and Trust Company had never tendered or caused to be tendered to him a good and sufficient deed to said property.

In rebuttal plaintiff put in evidence a bill filed by Spratt and Barnett on the 6th day of November, 1882, against John J. Knox, Commissioner of the said Freedman's Savings and Trust Company, and George Wheaton Deans as administrator of the estate of Jacob Foreman, deceased. The purpose for which this bill was introduced was to show that Spratt and Barnett recognized the relation of purchaser of the property on the part of Spratt and that he was thereby seeking as such purchaser to have the Commissioner of the Freedman's Savings and Trust Company to execute a deed to said property by virtue of his said purchase. The allegations of this bill are set out in the case of Knox *et al.* vs. Spratt and Barnett, 19 Fla., 817. The mandate of this court in the case referred to on a reversal of the decision of the Circuit Court in refusing to dissolve an injunction therein granted, was also put in evidence. An affidavit of Spratt filed May 2nd, 1884, in a suit then pending in the Circuit Court for Duval county wherein he was complainant and George Wheaton Deans and John J. Knox, as Commissioner of the Freedman's Savings and Trust Company were defendants, was also introduced in evidence. The purpose being to further show that Spratt still recognized his status as purchaser of the property from the Freedman's Savings and Trust Company.

The plaintiff also showed by the sheriff of Duval county that he had paid the balance of the proceeds

33

arising from the sale of the property at execution sale, after satisfying the judgment obtained by Greeley, to the Commissioner of the Freedman's Savings and Trust Company.

Counsel for appellants insist here as grounds for reversing the judgment appealed from that the appellee, Livingston, acquired no title whatever at the execution sale under the judgment of Greeley against Trenholm, as Commissioner of the Freedman's Savings and Trust Company, or that he did not acquire from this source such a title as will sustain a recovery in ejectment; and conceding such to be the case, that Spratt had been in actual continuous and adverse possession of the parcel of land in controversy for seven years before the institution of the suit.

It is contended first that Trenholm was the mere trustee and holder of the bare legal title of the lot, and its sale under execution against him transferred no beneficial interest whatever to Livingston. To understand Trenholm's status to the lot in question at the date of sale a reference to the act of Congress creating the Freedman's Savings and Trust Company, and the amendments thereto is necessary. By act of Congress approved March 3rd, A. D. 1865, certain named individuals, fifty in number, and their successors were constituted a body corporate by the name of ."The Freedman's Savings and Trust Company" and by that name could sue and be sued in any court of the United States. The corporators named were the first trustees of the corporation, and its business was to be managed and directed by the board of trustees with authority and direction to elect from their number a president and two vice-presidents, and also to appoint such other officers as might be deemed fit. The general business of this corporation was to receive on deposit such sums of

money as might be offered by, or on account of persons who had before the passage of the act been held in slavery in the United States, or their descendants, and to invest the same in stocks, bonds, treasury notes, or other securities of the United States. Provisions were made for the investment of the deposits to be made, and also for the repayment of the same with interest thereon to the depositors. One of the provisions of the 12th section of the act is "that no president, vice-president, trustee, officer, or servant of the corporation shall, directly or indirectly, borrow the funds of the corporation or its deposits, or in any manner use the same, or any part thereof, except to pay necessary expenses, under the direction of the board of trustees." The board of trustees was authorized to fix the salaries of the president, vice-presidents, subordinate officers and agents of the corporation.

The original act was amended in 1874, Chapter 349, United States Statutes at Large.

The only provisions of this amendatory act necessary to be referred to here are those contained in the seventh section. This section provides "that whenever it shall be deemed advisable by the trustees of said corporation to close up its entire business, then they shall select three competent men, not connected with the previous management of the institution and approved by the Secretary of the Treasury, to be known and styled commissioners, whose duty it shall be to take charge of all the property and effects of said Freedman's Savings and Trust Company, close up the principal and subordinate branches, collect from the branches all the deposits they have on hand, and proceed to collect all sums due said company, and dispose of all the property owned by said company, as speedily as the interests of the corporation require, and to distribute the

proceeds among the creditors pro rata, according to their respective amounts; they shall make a pro rata dividend whenever they have funds enough to pay twenty per centum of the claims of depositors. Said commissioners, before they proceed to act, shall exe. cute a joint bond to the United States, with good sureties, in the penal sum of one hundred thousand dollars, conditioned for the faithful discharge of their duties as commissioners aforesaid, and shall take an oath to faithfully and honestly perform their duties as such, which bond shall be executed in the presence of the Secretary of the Treasury, be approved by him, and by him safely kept; and whenever said trustees shall file with the Secretary of the Treasury a certified copy of the order appointing said commissioners, and they shall have executed the bond and taken the oath aforesaid, then said commissioners shall be invested with the legal title to all of said property of said company, for the purposes of this act, and shall have full power and authority to sell the same, and make deeds of conveyance to any and all of the estate sold by them to the purchasers. Said commissioners may employ such agents as are necessary to assist them in closing up said company, and pay them a reasonable compensation for their services out of the funds of said company; and the said commissioners shall retain out of said funds a reasonable compensation for their trouble, to be fixed by the Secretary of the Treasury and the Comptroller of the Currency, and not exceeding three thousand dollars each per annum. Said commissioners shall deposit all sums collected by them in the Treasury of the United States until they make a pro rata distribution of the same.''

There was still a further amendment to the charter

of the Freedman's Savings and Trust Company, passed in 1881, Chapter 64, United States Statute at Large.

By this act, Section seven of the amendatory act of 1874 was repealed, and the Secretary of the Treasury was authorized and directed to appoint the Comptroller of the Currency a commissioner, who was required to give bond and take an oath faithfully to perform his duties, and when the bond was given and oath taken, said commissioner was invested with the possession and legal title of all the property of the Freedman's Savings and Trust Company for the purposes of this act and the act of 1874, Chapter 349, United States Statutes at Large. Said commissioner was also invested with all the rights, prerogatives and privileges, and required to perform all the duties that were conferred and enjoined upon the three commissioners under the said act of 1874, and from and after his qualification as such commissioner, the duties, rights, and authority of said three commissioners should cease and determine; provided, that nothing in the act should in any way impede or delay any case or cases instituted in any court by or against the said three commissioners appointed under the act of 1874; but every such case should, upon the suggestion of the appointment of the Comptroller as commissioner aforesaid, and due entry of the change on the docket of the court in which such cause was pending, be proceeded with in the name of such Comptroller in the same manner as if such change had not been made.

The act of 1881, Chapter 64, also provides "that said commissioner, with the approval of the Secretary of the Treasury, shall have the right and authority to sell any of the real and personal property of said company at public or private sale, as in his judgment he may deem best, and to buy in for the benefit of the com-

pany any property which may be offered for sale to pay debts and liabilities of said company, if in his judgment said property is being sacrificed by such sale, and to make to the purchasers of property sold by him deeds of conveyance for their respective purchases."

Such was the relation of William L. Trenholm, Comptroller of the Currency, to the Freedman's Savings and Trust Company and its property at the time Greeley obtained judgment against him as commissioner of said company. By act of Congress, the same power that created the Freedman's Savings and Trust Company, he, by virtue of his office of Comptroller of the Currency, was made a commissioner for this institution with the concurrence of the corporators, and as such was invested with the full title and possession of all of its property for the purpose of closing up its entire business. To this end he had express power and authority to dispose of all the property of the company and to employ such agents as were necessary to assist him in winding up its affairs, and to pay them reasonable compensation for their services out of the corporate funds. The evident design and effect of the act of Congress in making the Comptroller of the Currency a commissioner for the institution named were to confer upon him as such the entire and complete management and disposition of the affairs of said company for the purpose of liquidation. He was the statutory substitute and successor of the company for the purpose mentioned. The record discloses the fact that Greeley's suit was to recover for expenditures of money and services rendered by him as agent for such commissioner in winding up a branch business of the company at Jacksonville, Florida, the principal office

being in Washington, D. C., and the commissioner residing there.

It is not denied that the title of the Freedman's Savings and Trust Company to the property involved in the case before us was vested in the said commissioner at the time Greeley commenced his suit of attachment against him. Spratt had gone into possession of this property under a contract of purchase from the commissioner, and as a consequence is not in a situation to deny his title. The commissioner, when sued at law by Greeley, did not object to the jurisdiction of the court, but interposed pleas to the merits of the cause, and when the property had been sold under execution, accepted the surplus arising from the sale after paying Greeley's judgment. Furthermore, it does not appear that any effort was ever made by any beneficiary of the company to arrest the proceedings at law against the commissioner, nor is the title to the property now called in question by any such person. The question then is, could the legal title held by the commissioner be sold under execution at law and transferred to the purchaser? It can not be denied that the title held by the commissioner was coupled with a trust, but that trust was the winding up of the entire business of the corporation. It included the collection of all debts due the company, a sale of all of its property, the payment of all of its debts and necessary expenses in closing up the business, and the disbursement of the remaining funds to the depositors.

Mr. Perry, in his book on Trusts, Section 321, says: "As a general rule, the legal estate in the hands of a trustee has at common law precisely the same properties, characteristics and incidents, as if the trustee were the absolute beneficial owner," and he also states that the trustee may sell and devise the estate held by

him, and it may be taken in execution. This is qualified, however, as follows: "but these incidents do not generally interfere with the proper execution of the trust, for all conveyances and all encumbrances made or imposed upon the estate by the trustee, for other purposes than those of the trust, or in breach of the trust, are entirely disregarded by a court of equity, whatever may be the effect of such conveyances or encumbrances in a court of common law." There are authorities maintaining the view urged by counsel for appellee here, that a bare legal title in trust can be sold under execution against the trustee, and that a purchaser at such sale will acquire the title of the trustee, whatever it may be. The cases cited by counsel go to this extent. But there is a conflict in the law on this point, and many authorities hold that if one is the mere holder of a bare legal title for the benefit of another, an execution sale of such an estate against him transfers no interest whatever. If the estate and title of the commissioner in and to the property in question in this suit come within the character of the estates just mentioned, there is serious difficulty in holding upon the weight of authority that it can be taken in execution at law.

But it is further insisted for appellee that as the Freedman's Savings and Trust Company was a foreign corporation doing business in this State, the commissioner, appointed by authority of law to represent and act for it in winding up its business, came within the provisions and spirit of our attachment statute, and suits could be instituted against him as against the corporation itself on all liabilities properly incurred by him in closing up the business of the corporation, and that for this purpose, to the extent of the powers conferred, the commissioner stood as a corporation sole li-

able to be sued as a non-resident corporation. Our statute (Chapter 1637, sec. 29; McClellan's Digest, page 233, sec. 22), provides that "any company incorporated by any other state or country, or by law of Congress, and having property in this State, shall be liable to be sued, and the property of the same shall be liable to attachment in the same manner as individuals, residents of other states or countries, and having property in this State." If suit of attachment had been instituted in this State against the Freedman's Savings and Trust Company, on a valid claim against it while it was the owner of property here, no doubt could exist as to the applicability of this statute to such suit. The supposed difficulty in the case before us is that Greeley's suit was not against the Freedman's Savings and Trust Company, but against the commissioner appointed to wind up its business, and for a debt incurred by him in the performance of his duties as such commissioner. We are satisfied from an examination of the act of Congress and the amendments thereto that the Comptroller of the Currency, as Commissioner of the Freedman's Saving and Trust Company, did not sustain to said company and its depositors the relation of a trustee of a mere naked title for the benefit of the depositors. The original incorporators of this company, denominated trustees, occupied a trust relation to the depositors, yet it is evident that said trustees represented and stood for the corporation itself, and in this respect could sue, and were liable to be sued in the corporate name on all matters connected with the legitimate business of the company. By the amendments to the original act, Congress substituted the Comptroller of the Currency in place of the original trustees for the purpose of winding up the affairs of the institution. As we have before said,

he was the statutory substitute and successor of the company for the purposes of liquidation. His status was not that of a receiver of such company under the appointment of a court, nor does the office of an administrator conferred in a foreign jurisdiction properly illustrate his attitude. The views expressed by Chief-Justice Waite, in speaking for the court in the case of Relfe vs. Rundle, 103 U. S., 222, in reference to the status of a statutory successor of a dissolved corporation aptly describe, we think, the office and functions of the commissioner in reference to the corporation named and its property. By the laws of Missouri the Superintendent of the Insurance Department of the state government was authorized under certain circumstances to commence proceedings to dissolve insurance corporations organized under the laws of that state. A statute provided that "upon the rendition of a final judgment dissolving a company or declaring it insolvent, all the assets of such company shall vest in fee simple and absolutely in the Superintendent of the Insurance Department of this state, and his successor or successors in office, who shall hold and dispose of the same for the use and benefit of the creditors and policy-holders of such company, and such other persons as may be interested in such assets." A certain insurance company was dissolved by a decree of the Missouri court, and Rundle and wife, policy-holders of the company, commenced suit in the state of Louisiana against said company, its local agent in the city of New Orleans, and a party who had recovered a judgment against it, for the purpose of having the assets in Louisiana of the dissolved corporation declared a trust fund to be applied to the payment of claims of Louisiana creditors and policy-holders. Relfe, who was the Superintendent of the Insurance Department

of the state of Missouri, was made a party to the suit in Louisiana on his own motion, and then petitioned for the removal of the cause to the Circuit Court of the United States for the district of Louisiana, and also filed within time in that court a copy of the record in the state court and gave the security required by act of Congress. A motion was sustained to strike the cause from the docket of the Circuit Court on the ground, among others, that Relfe had no standing in the court, he being a creature of the state of Missouri, without capacity to sue or defend causes in the state of Louisiana. The opinion referred to says that "Relfe is not an officer of the Missouri state court, but the person designated by law to take the property of any dissolved life insurance corporation of that state, and hold and dispose of it in trust for the uses and benefit of creditors, and other parties interested. The law which clothed him with this trust was, in legal effect, part of the charter of the corporation. He was the statutory successor of the corporation for the purpose of winding up its affairs. As such he represents the corporation at all times and places in all matters connected with his trust. He is the trustee of an express trust, with all the rights which properly belong to such a position. He is an officer of the state, and as such represents the state in its sovereignty while performing its public duties connected with the winding up of the affairs of one of its insolvent and dissolved corporations. His authority does not come from the decree of the court, but from the statute. He appeared in Louisiana not by virtue of any appointment from the court, but as the statutory successor of a corporation which the court had in a legitimate way dissolved and put out of existence. He was in fact the corporation itself for all the purposes of winding

up its affairs." It is further said in the opinion "we are aware that, except by virtue of some statutory authority, an administrator appointed in one state can not generally sue in another, and that a receiver appointed by a state court has no extra-territorial power; but a corporation is the creature of legislation and may be endowed with such powers as its creator sees fit to give. Necessarily it must act through agents, and the state which creates it may say who those agents shall be." So in the case before us Congress has vested in the Comptroller of the Currency as a commissioner all the rights, powers, property and liabilities of the Freedman's Savings and Trust Company for the purposes of liquidation, and the estate which he has is commensurate with the powers conferred. He represents the corporation at all times and places in all matters connected with his trust. That the corporation itself was liable to be sued and its property here attached is clear, and we think it equally clear that the property in the hands of the commissioner appointed by authority of law to stand for and represent the corporation in matters connected with his duties as such is liable to be reached by attachment. Our attachment laws furnish a remedy against non-resident debtors owning property in this State, and the right of the State through the process of the courts to so appropriate property within its jurisdiction is beyond question. The discussion in the case of Pennoyer vs. Neff, 95 U. S., 714, on this subject is exhaustive.

The case before us is to be distinguished from one of an ordinary trustee holding the bare legal title in trust for another in this, that the commissioner is vested by legislative authority with all the rights, powers and liabilities, for the purposes of liquidation, that the orig-

inal corporation had, and to this extent he is just as
liable to suit on matters within the scope of his author-
ity as the corporation itself would have been had it
acted, and is made so by legislative authority. No
law of trusts is violated by this construction. A gen-
eral rule applicable to such estates is, that the trustee.
takes a legal interest and estate commensurate in ex-
tent and duration with the object and extent of
the trust itself, and a legal interest and estate in him
will, if possible, be declared sufficient for the purposes
of the trust. Zabriskie vs. Morris & Essex R. R. Co.,
33 N. J. (Eq.), 22; West vs. Fitz, 109 Ill., 425; Neilson
vs. Lagow, 12 Howard, 98; Packard vs. Marshall, 138
Mass., 30; Wilcox vs. Wheeler, 47 N. H., 488; Wil-
liman vs. Holmes, 4 Rich. (Eq.), 475. Often-times the
estate in the trustee has been enlarged or curtailed
without regard to the terms of its duration to him in
order that the trust created may be accomplished, and
in the case before us, although the office of the com-
missioner is coupled with a trust, this will not conflict
with the powers, liabilities and estate conferred on
him by the act of Congress.

The other ground of defense relied upon in the trial
court, of adverse possession, can not be maintained,
It is clearly shown and not denied that Spratt went
into possession of the property sued for under an
agreement to purchase it from the Commissioner of the
Freedman's Savings and Trust Company. The record
before us shows that Spratt has persisted in the pos-
session of the property under a claim of right as ven-
dee from said commissioner, and has sought in the
courts a partial specific performance of the agreement
to convey the property to him. It seems that a deed
was tendered to him by the commissioner but was de-
clined on the ground that there was a partial failure

SUPREME COURT.

of title.   The right of Spratt to a specific performance was settled adversely to him in 1887 in the decision reported in in 23 Fla., 64.   From the date of his purchase up to the time of this decision  there is no question but that Spratt recognized his possession as that of vendee under his contract to buy from the commissioner.   Such a possession was irreconcilable with an adverse holding on his part.   Petty vs. Mays, 19 Fla., 652; Knox, Commissioner, vs. Spratt *et al.*, *Ibid. supra*; Hart vs. Bostwick, 14 Fla., 557.   Counsel for appellants concedes that a vendee in possession under a contract to purchase does not hold adversely to the vendor until there is a repudiation of such a relation between them, but he insists that the efforts of the commissioner and his agents to oust Spratt of his possession converted it into an adverse holding, and he can now rely upon it as a defense.   The difficulty about this position is that Spratt was unwilling to accept the view that his possession was adverse, but persistently resisted the demands of the commissioner on the ground that such possession was rightful under the agreement to purchase.   There is nothing to show that Spratt himself repudiated the relation of vendor and vendee, certainly up to the time of the decision in this court in 1887, and the present suit was commenced early in 1889.

Upon a review of the entire record we think the decision rendered in this case was correct, and the judgment is therefore affirmed.